# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
# WHEELING

**STANLEY J. GOLDEN,**

    Plaintiff,

v.                                                                                                   CIVIL ACTION NO. 5:17-CV-118
                                                                                                     (BAILEY)

**DONALD BARNETT** and
**WILLIAM H. HOWE,**
Trustees of the UMWA 1985 Retired Construction
Workers Pension Plan and 1978 Retired
Construction Workers Benefit Trust**,**

    Defendants.

**DONALD BARNETT** and
**WILLIAM H. HOWE,**
Trustees of the UMWA 1985 Retired Construction
Workers Pension Plan and 1978 Retired
Construction Workers Benefit Trust**,**

    Counterclaim Plaintiffs,

v.

**STANLEY J. GOLDEN,**

    Counterclaim Defendant.

## ORDER GRANTING IN PART PLAINTIFF'S MOTION
## FOR SUMMARY JUDGMENT AND DENYING DEFENDANTS'/
## COUNTERCLAIM PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT

Currently pending before this Court is Plaintiff's Motion for Summary Judgment [Doc. 18], filed December 19, 2017, and Defendants'/Counterclaim Plaintiffs' Cross-Motion for Summary Judgment [Doc. 23], filed March 5, 2018. Having been fully briefed, this matter is now ripe for decision. For the reasons set forth below, this Court **GRANTS IN PART**

Plaintiff's Motion for Summary Judgment **[Doc. 18]** and **DENIES** Defendants'/Counterclaim Plaintiffs' Cross-Motion for Summary Judgment **[Doc. 23]**. Plaintiff's request for an award of attorneys' fees and costs is **DENIED**. The remainder of plaintiff's Motion is **GRANTED**.

## BACKGROUND

Plaintiff, Stanley J. Golden, brings this action under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*, against defendants and counterclaim plaintiffs, Donald Barnett and William H. Howe, in their capacities as trustees of the UMWA 1985 Construction Workers Pension Plan (incorrectly named the 1985 Retired Construction Workers Pension Plan in the Complaint) and the 1978 Retired Construction Workers Benefit Trust (collectively, the "Funds").

Plaintiff began working for Allegheny Belting, Inc. ("Allegheny"), in 1980 as a construction worker pursuant to a Collective Bargaining Agreement ("CBA") between the United Mine Workers of America ("UMWA") and the Association of Bituminous Contractors. Allegheny was a participating employer to the Funds. On April 10, 2015, plaintiff's job at Allegheny was eliminated. Consequently, plaintiff applied for and began receiving retirement benefits and retiree health care benefits from the Funds.

Sometime later, plaintiff received a letter dated September 14, 2016, which read, in pertinent part, as follows:

Dear Mr. Golden,

As you know, you currently receive a monthly pension benefit from the UMWA 1985 Construction Workers Pension Plan ("Plan") based in part on your service with Allegheny Belting ("Company"). We recently discovered that you may have held an ownership, management or operational position with Allegheny Belting during all or some of the period during which your pension was earned. As you may know, individuals who hold a

management, ownership, or operational position with a contributing employer are not eligible to earn pension credit under the Plan. We are writing to determine whether you held such a position with the Company.

Specifically, Article IV(C)(4) of the Plan provides, "No credit for service shall be awarded a Participant for any period in which such Participant was directly connected with the ownership, operation, or management of a construction employer." We understand, for instance, that you served as vice-president of the Company. If you served as vice-president during the period when your pension benefit was earned or functioned in some other ownership, management or operational position, your benefit amount must be adjusted. If you believe you did not hold a management, ownership, or operational position with Allegheny while you were receiving credit under the Plan, you must forward documentation of this. . . .

[Doc. 1-8 at 2]. In response, plaintiff vehemently denied ever serving in an ownership, management, or operational position with Allegheny. In a letter dated October 28, 2016, plaintiff stated as follows:

I did not hold an ownership, operational or managerial position with Allegheny. I was not connected with the day to day operations of the company. I did not set up the jobs, bid for jobs, do the work schedules, or decide the wages. I was not privy to the finances of the company, the tax records, or the wages of the other employees. I was not given bonuses or extra compensation that management might receive. Also, I made no decisions on the hiring of employees, etc. Additionally, I am not aware of any time when I was to have been elected as an officer of the company, nor do I have records to that effect.

[Id. at 12]. In an earlier letter, plaintiff indicated he was given stock in Allegheny when it was incorporated and that he continued to be a shareholder [Id. at 3]. However, plaintiff stated in the October 28, 2016, letter that he "never received any written documentation to that effect," that he did not have "any proof of ownership," and that he "never received any monetary gain of stock from the company" [Id. at 12].

The Funds' Coordinator then sent a letter to Richard Golden, plaintiff's brother and President of Allegheny, requesting information regarding plaintiff's position with Allegheny

3

[Id. at 14]. Richard Golden's response stated as follows:

> We are a family owned business started in 1979 by our parents Stanley T Golden and Ann Golden. The [i]nitial 1000 shares of stock were owned by them. In 1982[,] Stanley T and Ann gave 150 shares of stock to each of their 3 children. Richard T-150 shares, Stanley John [plaintiff]-150 shares[,] and Deborah A-150 shares. Stanley T and Ann retained 550 shares.
>
> There was discussion of naming Stanley John [plaintiff] as a vice president in late 1999[,] however a change of heart by Ann prevented anything from officially being ratified during any of the meetings. She questioned his ability to make financial and personnel decisions and he was never given power or permission to handle either the workforce or finances. He remained a crew leader as many of the other employees (myself included) did during these many years. We never employed over 25 people at one time and have averaged in the low teens over the years[,] which necessitates all employees produce billable hours.
>
> In September of 2005[,] after the death of Stanley T and with health concerns of her own[,] Ann dispersed her stock as follows: Richard T-additional 400 shares for a total of 550[,] Stanley J [plaintiff] an additional 75 with a total of 225 and Deborah A an additional 75 with a total of 225. Enclosed [are] transfer minutes.
>
> I hope this clears up any confusion and misinformation that may have been understood by all parties involved. As minority stockholders we were not privy to most of the meetings and since the death of Ann last year there has been a tension in the relationships between Stanley J [plaintiff] and his siblings. As a company we take good care of our employees and have gone beyond any contractual obligations to compensate them including generous travel and meal expenses. There also is a 401k that ALL employees share in equally but as for any other profit or dividend sharing there was nothing given to Stanley J [plaintiff] or the other siblings.

[Id. at 15].

The enclosed minutes supported Richard Golden's statement that in 1982 Stanley T. Golden gave 150 shares to each of his three children, including plaintiff, and that he and Ann Golden retained 550 shares [Id. at 19]. The June 1, 1982, Annual Meeting minutes also show that all five members of the Golden family, including plaintiff, were elected as "Directors" [Id.]. There were no minutes enclosed that memorialized the transfer of stock

4

as described in September 2005. However, there were minutes enclosed from July 20, 2005, that stated, in pertinent part, the following:

> Order of Business—Transfer of Stock Owned by Ann Golden to Richard Golden, Stanley J. Golden, and Deborah Riva.
>
> Current Shareholders and Shares:
> Stanley T & Ann Golden – 550 shares
> Richard T Golden – 150 shares
> Stanley J Golden – 150 shares
> Deborah A Riva – 150 shares
>
> After Proposed Transfer from Ann Golden:
> Richard T Golden – 520 shares
> Stanley J Golden – 165 [shares]
> Ann Golden – 150 [shares]
> Deborah A Riva – 165 [shares]
>
> Action tabled following protest from Stanley J Golden and Deborah Riva. Richard Golden requested buyout if no action taken.
>
> Next meeting to be held Sept. 9[,] 2005[,] at same location.

[Id. at 18].

Based on this information provided by plaintiff and Richard Golden, plaintiff was informed by letter dated February 24, 2017, from the Funds' counsel that the Funds' trustees concluded plaintiff "served in a management, ownership or operational position for all periods" during which plaintiff was credited with service under the Funds [Id. at 20]. As a result, plaintiff was informed his retirement benefits and retiree health care coverage were to be terminated as of April 1, 2017 [Id.]. Further, plaintiff was also told that all pension benefit payments made to him and health benefits paid on his behalf "must be repaid," as they were "overpayment[s]" plaintiff was "not entitled" to [Id.]. Plaintiff was told to remit a total of $53,015.27 to the Funds within ten days of the date of the letter [Id.].

On February 27, 2017, Richard Golden wrote an e-mail to the Funds' counsel

5

expressing his opinion that the Funds made a mistake in denying plaintiff his benefits. The e-mail read, in pertinent part, as follows:

> I was shown a copy of [the] letter dated February 24, 2017[,] that your office sent to Mr[.] Stanley J Golden denying his benefits. You stated in the letter that he was in a management position. When I sent the UMWA office copies of the stock transactions a few months ago[,] I also sent notes and documentation that he never was in a management position of any sort. . . . I hope that there was not some confusion with the founder and president of Allegheny Belting[,] Mr. Stanley T Golden (now deceased)[,] which is the only reason that you could make a statement of his being somehow in charge of people, property or finances at Allegheny Belting. There is a strained relationship between Stanley J and myself which prevents direct contact between us[,] but this matter needs corrected and I would appreciate being able to speak to you regarding this situation.

[Id. at 22].

On February 28, 2017, plaintiff also e-mailed the Funds' counsel and requested the documents provided by Allegheny on which the trustees made their decision [Id. at 23]. Funds' counsel e-mailed the requested documents to plaintiff on March 2, 2017, and directed plaintiff's attention to the meeting minutes dated June 1, 1982, which reflected that he owned 150 of 1000 shares of Allegheny and that he was elected a Director of Allegheny [Id. at 24]. In response, after reviewing the documents, plaintiff stated that he "was never present at the time [he] was supposed to have been made a director and given 'stock' in the company, nor did [he] sign anything to that effect" [Id. at 26].

Plaintiff retained counsel and filed an appeal of the Funds' decision on April 20, 2017 [Id. at 30]. Plaintiff's appeal, in pertinent part, read as follows:

> For his entire employment at Allegheny Belting, Inc., [plaintiff] was a dues-paying member of the United Mine Workers of America and worked as a non-supervisory bargaining unit employee. Pension and health and welfare contributions were made on his behalf for his entire career to the Funds. He never served in any supervisory or managerial position with this company. The only job that he performed other than his normal bargaining unit job was

6

to serve as the Union Representative on the Company's Safety Committee. (See enclosed Affidavit of Richard T. Golden, President of Allegheny Belting, Inc. ("Golden Affidavit")).

[Plaintiff] was never provided with stock certificates in Allegheny Belting, Inc. (See enclosed Golden Affidavit). [Plaintiff] was never notified that he was named as a director of the closely-held corporation (see enclosed Golden Affidavit). The first time Mr. Golden learned that he was named as a director was when he received the February 24, 2017[,] letter from [Funds' counsel].

[Plaintiff] never attended any board of director meetings or any management-level meetings of Allegheny Belting, Inc., except as an invitee at one meeting of the Board of Directors in 2005. (See enclosed Golden Affidavit). [Plaintiff] never received any compensation from Allegheny Belting, Inc., except wages for work performed as a bargaining unit member under the United Mine Workers of America Collective Bargaining Agreement. (See enclosed Golden Affidavit). [Plaintiff] has not possessed or exercised any indicia of ownership in Allegheny Belting, Inc.[,] during his employment with the Company. (See enclosed Golden Affidavit).

[Plaintiff] never received any dividends from Allegheny Belting, Inc.[,] as a result of any stock ownership in the Company. [Plaintiff] and his sister inherited the land upon which Allegheny Belting, Inc.[,] is situated. There is no written lease agreement in existence between [plaintiff] and the Company and he received no rent from the Company. As a result of an IRS audit of Allegheny Belting, Inc., in 2012 the Company made a payment in the [a]mount of $4,500.00 to [plaintiff] to reimburse him for income taxes he paid as a result of the Company's failure to pay him rent for the property, which for tax purposes it characterized as a dividend. (See attached Form 1099-DIV, Schedule B and letter from Allegheny Belting, Inc.'s accountant, Thomas P. Criste.)

It cannot reasonably be concluded that [plaintiff] held an operational or ownership position in Allegheny Belting, Inc.[,] at any time during his employment with the Company. [Plaintiff] is no different than any other dues-paying member of the United Mine Workers Union of America who has worked as a bargaining unit member his entire career with the promise of a pension and health care benefits upon retirement.

The obvious purpose of the language in the Plan document, excluding from coverage of the pension and health care coverage supervisors, managers and Company owners, is to restrict the Plan to bargaining unit members. [Plaintiff] has been a Union employee his entire career and only a tortured interpretation of the Plan document could exclude him from coverage. I respectfully submit that to deny [plaintiff] his pension and health care

7

coverage would be a complete abuse of discretion by the Board of Trustees.
[Id. at 30–32]. The arguments citing to the "Golden Affidavit" were, in fact, supported by an included affidavit of Richard Golden [Id. at 33]. The arguments made in the fourth paragraph above, regarding dividends, were also supported by the cited materials [Id. at 35–37].

By letter dated May 26, 2017, plaintiff's appeal was denied [Id. at 39]. The letter stated, in pertinent part, as follows:

> On May 23, 2017[,] the Boards of Trustees of the UMWA 1985 Retired Construction Workers Pension Plan ("CWPP") and 1978 Retired Construction Workers Benefit Trust ("RCW") (together the "Funds") met and considered the benefit Appeal of [plaintiff] from the Funds' February 24, 2017[,] determination. For the reasons stated below, the Appeal has been denied.
>
> The Appeal asserts that Mr. Golden had no operational or management responsibilities with respect to Allegheny Belting, Inc. (the "Employer"). However, please note that the Funds' February 24, 2017[,] determination was not based on a finding of either operational or management responsibilities. Rather, it was based on [plaintiff's] ownership of, at various times, roughly 15 to 22% of the Employer's outstanding stock.
>
> The Appeal does not dispute Mr. Golden's ownership of the Employer, and acknowledges the pertinent provision of the CWPP plan of benefits—namely Article IV Section C, which provides that no credit may be given for any period a participant was directly connected with the <u>ownership</u>, operation or management of a construction employer (emphasis added). Here, there is no dispute, whatever his level of operational or financial involvement with the Employer, that [plaintiff] was an owner of the Employer. Since there is no exception in the CWPP's plan of benefits that provides a basis for the provision of credit to [plaintiff] in this case, the Boards have rejected Mr. Golden's appeal. In this regard, you may wish to review ***Coleman v. Holland***, 2005 U.S. Dist. Lexis 25953 (W.D. Va. 2005), in which the United States District Court [for the Western District of Virginia] rejected a similar claim.

[Id.]. His appeal being denied, plaintiff now brings this action asking this Court to reverse the Funds' decision.

8

**STANDARD OF REVIEW**

"An ERISA benefit plan administrator's denial of benefits is reviewed 'under a *de novo* standard unless the benefit plan gives the administrator . . . discretionary authority to determine eligibility for benefits or to construe the terms of the plan,' ***Firestone Tire & Rubber Co. v. Bruch***, 489 U.S. 101, 115 (1989), in which case the denial of benefits is reviewed for abuse of discretion." ***Janiszewski v. Lincoln Nat. Life Ins. Co.***, 2014 WL 10894550, at *4 (N.D. W.Va. Aug. 18, 2014) (Bailey, J.) (citing ***Evans v. Eaton Corp. Long Term Disability Plan***, 514 F.3d 315, 321 (4th Cir. 2008)). Here, the express terms of the relevant plans grant defendant such discretionary authority.

Article VIII(A) of the UMWA 1985 Construction Workers' Pension Plan provides that "[t]he Trustees or such other named fiduciaries as may be properly designated shall have full and final determination as to all issues concerning eligibility for benefits" [Doc. 1-2 at 51]. Further, Article VIII(B)(5) provides, in pertinent part, that "[t]he Board of Trustees, in the exercise of its discretion in making benefit determinations under this Section, will apply the terms of the Plan and any applicable guidelines, rules and schedules, as may be adopted by the Board of Trustees from time to time . . ." [Id. at 52]. Additionally, Article VIII(B)(7) provides, in pertinent part, that "[t]he decision of the Board of Trustees is final and binding" [Id.]. Finally, eligibility under the 1978 Retired Construction Workers Benefit Plan is based on "receiving a pension under the UMWA 1985 Construction Workers Pension Plan," [Doc. 1-3 at 6], and thus the same discretionary authority applies.

Therefore, "because the plan specifically grants defendant discretion to determine eligibility for benefits and to construe terms of the plan, abuse of discretion is the correct

standard of review." *Janiszewski*, 2014 WL 10894550, at *4 (citing **Tucci v. First Unum Life Ins. Co.**, 446 F.Supp.2d 473, 482 (D.S.C. 2006) (holding that plan language granting administrator "discretionary authority to determine . . . eligibility for benefits and to interpret . . . the policy" rendered abuse of discretion review appropriate)). Further, plaintiff concedes that abuse of discretion is the correct standard of review [Doc. 19 at 9] ("In the instant case, the Plan does give discretion to the Plan Trustees to interpret the Plans; therefore, the standard [is] arbitrary and capricious or an abuse of discretion.").

"Under the abuse-of-discretion standard, we will not disturb a plan administrator's decision if the decision is reasonable, even if we would have come to a contrary conclusion independently. **Ellis** [**v. Metro. Life Ins. Co.**, 126 F.3d 228, 232 (4th Cir. 1997)]. Thus, we may not substitute our own judgment in place of the judgment of the plan administrator. See **Berry v. Ciba-Geigy Corp.**, 761 F.2d 1003, 1008 (4th Cir. 1985). To be held reasonable, the administrator's decision must result from a 'deliberate, principled reasoning process' and be supported by substantial evidence. **Guthrie v. Nat'l Rural Elec. Coop. Assoc. Long Term Disability Plan**, 509 F.3d 644, 651 (4th Cir. 2007); **Brogan v. Holland**, 105 F.3d 158, 161 (4th Cir. 1997)." **Williams v. Metropolitan Life Ins. Co.**, 609 F.3d 622, 630 (4th Cir. 2010); see also **Bernstein v. CapitalCare, Inc.**, 70 F.3d 783, 788 (4th Cir. 1985); **Doe v. Group Hosp. & Med. Servs.**, 3 F.3d 80, 85 (4th Cir. 1993). "Substantial evidence . . . is evidence which a reasoning mind would accept as sufficient to support a particular conclusion." **Laws v. Celebrezze**, 368 F.2d 640, 642 (4th Cir. 1966). Such evidence consists of "more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Id.*; see also **Ellis**, 126 F.3d at 235.

In considering the reasonableness of a fiduciary's discretionary decision, this Court may consider the following factors:

> (1) the language of the plan; (2) the purposes and goals of the plan; (3) the adequacy of the materials considered to make the decision and the degree to which they support it; (4) whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan; (5) whether the decisionmaking process was reasoned and principled; (6) whether the decision was consistent with the procedural and substantive requirements of ERISA; (7) any external standard relevant to the exercise of discretion; and (8) the fiduciary's motives and any conflict of interest it may have.

**Booth v. Wal-Mart Stores, Inc. Assocs. Health & Welfare Plan**, 201 F.3d 335, 342–43 (4th Cir. 2000).

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Where the court must decide the case on the basis of an administrative record, the summary judgment motion "stands in a somewhat unusual light, in that the administrative record provides the complete factual predicate for the court's review." **Krichbaum v. Kelley**, 844 F.Supp. 1107, 1110 (W.D. Va. 1994), *aff'd*, 1995 WL 449668 (4th Cir. July 31, 1995). Because the factual record is closed, the "plaintiff's burden on summary judgment is not materially different from his ultimate burden on the merits." **Id.** "To survive summary judgment, then, plaintiff must point to facts in the administrative record—or to factual failing in that record—which can support his claims under the governing legal standard." **Id.**; *see also* **Marcum v. Zimmer**, 887 F.Supp. 891, 896 (S.D. W.Va. 1995); **Sheppard & Enoch Pratt Hosp., Inc. v. Travelers Ins. Co.**, 32 F.3d 120, 125 (4th Cir. 1994).

With these principles in mind, this Court turns to the denial of benefits at issue.

**DISCUSSION**

Based upon its review of the administrative record, this Court concludes that the defendants' decision to terminate plaintiff's benefits, based on the determination that plaintiff was "directly connected with ownership," was unreasonable. Accordingly, this Court will grant in part Plaintiff's Motion for Summary Judgment [Doc. 18] and will deny Defendants'/Counterclaim Plaintiffs' Cross-Motion for Summary Judgment [Doc. 23].

At a glance, defendants' decision may appear reasonable. Ultimately, defendants determined plaintiff was "directly connected with ownership" based on his "ownership of, at various times, roughly 15 to 22% of the Employer's outstanding stock" [Doc. 1-8 at 39]. On its face, that may seem like a reasonable determination based on the language of the pension plan. However, the language of the plan is but one factor this Court may consider in reviewing the reasonableness of defendants' discretionary decision. *See* **Booth**, 201 F.3d at 342–43.

Another factor this Court may consider, and one which it finds important, is "the purpose and goals of the plan." ***Id.*** The purpose of the plan, and the purpose of the "directly connected with the ownership, operation, or management" provision ("the exclusion provision") itself, have to be considered in interpreting the exclusion provision and basing eligibility decisions on it.

In looking at the exclusion provision from an earlier version of the pension plan, another court found that "[t]he rationale behind this provision is that the Fund is for the benefit of employees and not employers." **Champion v. Davis**, 459 F.Supp. 305, 308 (N.D. Ala. 1978) (citing **Gomez v. Lewis**, 414 F.2d 1312 (3d Cir. 1969)). This makes

sense. The Funds are for the benefit of the average bargaining-unit employee performing work pursuant to the CBA. Therefore, supervisory employees and employers, who are exempted from the CBA, should also be excluded from coverage under the Funds. *See* Article 2 of the CBA, [Doc. 1-1 at 3].

Excluding plaintiff from coverage, however, goes against that purpose, as he was never an "employer," "supervisor," "manager," or "owner" in any real sense of those words. The record is clear that plaintiff never held any supervisory or managerial position, and defendants did not base their findings on a different conclusion. In the letter notifying plaintiff his appeal had been denied, Funds counsel stated "the Funds' February 24, 2017[,] determination was not based on a finding of either operational or management responsibilities. Rather, it was based on [plaintiff's] ownership of, at various times, roughly 15 to 22% of the Employer's outstanding stock. . . . Here, there is no dispute, whatever his level of operational or financial involvement with the Employer, that [plaintiff] was an owner of the Employer" [Doc. 1-8 at 39]. Thus, defendants' decision was based on classifying plaintiff as an "owner." However, this Court agrees with plaintiff's assertion that "only a hypertechnical and tortured interpretation of the Plan document could characterize him as an 'owner'" [Doc. 19 at 8].

While, on-paper, plaintiff may have been a shareholder in Allegheny, in reality he was no different than any other UMWA construction worker. For over three decades, plaintiff worked as a bargaining unit construction worker and was a dues-paying member of the UMWA. Throughout that time, contributions were made to the Funds based upon his bargaining unit hours of work. Plaintiff "never received any compensation for anything other than wages for work performed as a member of the UMWA bargaining unit" [Doc. 1-8

13

at 33]. While the evidence in the record does not necessarily support plaintiff's contention that he was "unaware" he owned stock in Allegheny, it is undisputed that he was never issued stock certificates or any other document proving ownership. Plaintiff was not present at the meeting he was allegedly given stock in Allegheny and elected a "director," nor was he ever notified that he was named as a "director" of the company. He "never attended any board of director meetings or any management-level meetings of Allegheny Belting, Inc., except as an invitee at one meeting of the Board of Directors in 2005" [Id.]. As Allegheny's President said, plaintiff did "not possess[] or exercise[] any indicia of ownership in Allegheny Belting, Inc. during his employment at Allegheny Belting, Inc." [Id.].

Potentially, plaintiff's stock holds some value, which theoretically could make him different from other UMWA construction workers. But what is that value? This Court does not know, nor did the defendants know when they made their eligibility determination. No shareholder agreement was ever presented, nor is there evidence that a shareholder agreement even exists. Thus, what is plaintiff entitled to as a shareholder in Allegheny? Is he entitled to a portion of the profits or to receive dividends? We do not know—but we know he never received either. Is he entitled to attend and vote at shareholder meetings? We do not know—but we know he was only invited to one. Could another shareholder buy-out his shares? Possibly—but it is also possible that Allegheny, like many small, family-owned businesses, could close its doors tomorrow, rendering the stock what it has always been to plaintiff—worthless. The point is, this Court does not know what benefit stock in Allegheny confers to plaintiff, but what is certain is that plaintiff has received *zero* benefits as a result of being a shareholder to this point, and most likely never will see any value out of his stock. Plaintiffs "ownership" interest did not even protect him from having his job

14

eliminated. Thus, this Court finds the determination that plaintiff was an "owner," simply based on him being a shareholder, was unreasonable in this context and against the purpose of both the Funds and the exclusion provision.

Defendants cited ***Coleman v. Holland***, 2005 WL 2857980 (W.D. Va. Nov. 1, 2005), in both their denial letter regarding plaintiff's appeal and in their present Motion, for the proposition that their decision to classify plaintiff as an owner based on his stockholding was reasonable. In ***Coleman***, the pension plan at issue had the same overriding exclusion provision that prevents anyone who is "directly connected with the ownership, operation, or management of a mine" from earning pension credit. *Id.* at *7–8. The trustees in ***Coleman*** determined that the plaintiff "had zero hours of pension credit for the years 1975 to 1998 because he was 'directly connected with the ownership, operation, or management' of his employer." *Id.* at *6. The trustees based this determination on the plaintiff's "ownership interest" in the two companies he worked for during that time period. *Id.* Plaintiff "was one of seven owners of [the first company] while it was in operation, and he owned twenty and twenty-five percent of [the second company] from July 1989 onward." *Id.*

However, there is a key distinction between the plaintiff in ***Coleman*** and the plaintiff here. The ***Coleman*** plaintiff was "being paid on a salary basis rather than at an hourly rate under the NBCWA [National Bituminous Coal Wage Agreement—which was an earlier version of the CBA plaintiff worked under here]." Brief of Appellees, ***Coleman***, 2005 WL 2857980 (No. 1:05-cv-8), 2006 WL 502078, at *8. Thus, the ***Coleman*** plaintiff did not work under the CBA and his ownership interest entitled him to a benefit, in the form of a salary,

15

that workers employed pursuant to the CBA were not afforded. Therefore, it made sense in *Coleman* to exclude the plaintiff from pension benefits, in order to prevent him from taking advantage of both the benefits afforded to owners and those afforded to employees, which is the type of activity the exclusion provision was meant to protect. The same is not true of plaintiff here, who earned wages his entire career for work performed as a member of the UMWA bargaining unit, pursuant to the CBA, and who, as described above, never enjoyed any benefit from his "ownership interest." Thus, to call these two cases "virtually identical" is, in reality, disingenuous. The *Coleman* plaintiff is the type of person the exclusion provision is meant to exclude—someone who is not just an employee but an actual owner in the true sense of the word. Plaintiff here, on the other hand, was just like everyone else, and therefore deserves the same pension as everyone else.

Defendants also rely on *Roberts v. Holland*, 1998 WL 454851 (4th Cir. July 29, 1998), but that case is also distinguishable. In *Roberts*, the plaintiff sought service credit for his employment with J&L Roberts Coal Company ("J&L") for the years 1959 through 1961. *Id.* at *1. The plaintiff was denied pension benefits because "Social Security Administration wage records indicated that he was self-employed and received no wages between 1959 and 1961 and evidence from a 1960 worker's compensation claim revealed that [plaintiff] was a one-fifth stockholder in J&L." *Id.* at 2. Thus, regardless of whether plaintiff was an "owner" or not based on his stockholdings, plaintiff could not receive credit for service because there was evidence he earned no wages from coal employment during the relevant period. That is clearly not the case with plaintiff here, who worked for a signatory company his entire career.

16

This Court also questions whether defendants' decision to deny plaintiff benefits was the result of a "deliberate, principled reasoning process." ***Williams***, 609 F.3d at 630. The minutes from the Board of Trustee meetings discussing plaintiff included in the record are heavily redacted, and contain mostly conclusions rather than reasoning. The minutes note the Trustees' conclusion that plaintiff "held an ownership or management position" was based on his stock ownership in Allegheny [Doc. 1-8 at 52]. It seems to this Court that the Trustees' decision was based on a simple equation: stock equals ownership. There is no indication of any discussion about all of the evidence indicating plaintiff was not an actual owner. Thus, it calls into question the deliberateness of the Trustees' reasoning process, and leads to what this Court believes is an unprincipled decision that goes against the purpose of the pension plan and the exclusion provision.

This simple reasoning process (stock equals ownership) can also lead to even more absurd results. For example, say for the holidays one year, a signatory company decided to issue one share of stock in the company to each of its employees. Under the reasoning the Trustees seemingly employ here, each of those employees would not receive credit for any time served while they were "owners" of that stock. This is despite the fact that the employees were given the stock, they did not seek it out, and most probably had no interest in being a shareholder. This would certainly be an unfair and unprincipled result, and one that would undermine ERISA's purpose. The same is true for plaintiff here, who was gifted stock that only worked to his detriment, never his benefit.

The evidence defendants relied on in determining plaintiff was a shareholder, and therefore an "owner," was also not the most substantial. The evidence supporting stock ownership were "the minutes concerning all stock transfers that have happened from the

17

company's founding in 1980 until 2014," which consisted of two documents, and a letter from plaintiff's estranged brother and current President of Allegheny explaining those minutes [Doc. 1-8 at 15–19]. There were no stock certificates or any other legal document that provided proof of ownership. There was no shareholder agreement or any other legal document that described share ownership and valuation, or any shareholder rights and responsibilities. Thus, even if the evidence before the defendants was sufficient to reasonably conclude plaintiff was a shareholder, there was no context to determine what being a shareholder in Allegheny actually meant. There was also substantial evidence before the defendants that indicated plaintiff was not an owner in any real sense. Thus, it is questionable whether the Trustees decision was "supported by substantial evidence." *Williams*, 609 F.3d at 630.

Finally, in considering the reasonableness of a fiduciary's discretionary decision, this Court may consider "the fiduciary's motives and any conflict of interest it may have." *Booth*, 201 F.3d at 342–43. Here, defendants have a duty to guard trust assets against improper claims. See *Sargent v. Holland*, 114 F.3d 33, 35 (4th Cir. 1997). Thus, they have an inherent interest in denying claims in order to preserve the trust corpus. One can see this inherent conflict of interest play out in case after case, where intended beneficiaries' claims are classified as improper based on hypertechnical interpretations of plan provisions. See, e.g., *Pratt v. Connors*, 857 F.2d 231 (4th Cir. 1988); *Smith v. United Mine Workers of America 1950 Pension Trust*, 576 F.Supp. 1419, 1422 (D.D.C. 1983). This is why "judicial review of the denial of benefits must be undertaken with a 'stern hand and flinty eye.' To do otherwise would unduly encourage the Trustees to overvalue

their duty to preserve the trust corpus 'at the expense of the intended beneficiaries.'" **Pratt**, 857 F.2d at 234 (quoting **Maggard v. O'Connell**, 671 F.2d 568, 572 (D.C. Cir. 1982)). For the reasons explained above, that is precisely what defendants' decision does here. It overvalues their duty to preserve the trust corpus at the expense of plaintiff, an intended beneficiary.

Defendants "must administer the Fund entrusted to them with a modicum of common sense." **Smith**, 576 F.Supp. at 1422. This Court has spent many pages explaining what common sense can tell us in one sentence: plaintiff is entitled to and deserves the benefits he seeks. This Court agrees with plaintiff's assertion that defendants' decision here "elevates form over substance to a degree that defies common sense" [Doc. 19 at 12]. Defendants' decision goes against the purpose of the pension plan and "overvalue[s] their duty to preserve the trust corpus 'at the expense of the intended beneficiaries.'" **Pratt**, 857 F.2d at 234 (quoting **Maggard**, 671 F.2d at 572). Thus, this Court is satisfied that the judicial deference normally due defendants in these circumstances cannot justify their action in this case. Therefore, this Court concludes that the termination of plaintiff's pension and health care benefits was unreasonable and an abuse of discretion. Defendants' denial of pension and health care benefits to plaintiff is therefore reversed.

As to plaintiff's request for an award of attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g)(1), that portion of his Motion is denied. Under the circumstances presented in this case, this Court does not find it appropriate to award any expenses or fees to either party, and finds that each party should bear the cost of their own fees and

expenses.

## CONCLUSION

For the reasons stated above, this Court **GRANTS IN PART** Plaintiff's Motion for Summary Judgment **[Doc. 18]**. Plaintiff's request for an award of attorneys' fees and costs is **DENIED**, but the remainder of plaintiff's Motion is **GRANTED**. It is **ORDERED** that each party shall bear the cost of their own fees and expenses. Further, this Court **DENIES** Defendants'/Counterclaim Plaintiffs' Cross-Motion for Summary Judgment **[Doc. 23]**. The Clerk is **DIRECTED** to enter judgment in favor of plaintiff and to **STRIKE** this action from the active docket of this Court.

It is so **ORDERED**.

The Clerk is directed to transmit copies of this Order to all counsel of record herein.

**DATED**: May 14, 2018.

JOHN PRESTON BAILEY
UNITED STATES DISTRICT JUDGE